**R.V. and E.V., parents and natural guardians of L.V., a minor, Petitioners,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 08–504 V

United States Court of Federal Claims.

(Filed Under Seal: June 2, 2016)

(Reissued: July 1, 2016)[1]

---

1. This opinion originally was issued under seal on June 2, 2016. The court afforded the parties an opportunity to propose redactions in the opinion prior to its reissue. No such redactions were proposed. However, on June 30, 2016, petitioners filed a motion asking for reconsideration of redaction pursuant to Rule 60 of the Rules of the Court of Federal Claims, explaining why no redactions were initially proposed. The court granted petitioners' motion for good cause shown. Those redactions are reflected in the caption and are indicated in brackets below.

Robert Joel Krakow, Law Office of Robert J. Krakow, P.C., New York, NY, for petitioner.

Heather Lynn Pearlman, United States Department of Justice, Civil Division, Washington, DC, for respondent.

National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa–1–34; Motion for Review; Autism; Influenza Vaccine

**OPINION AND ORDER**

YOCK, Senior Judge

This vaccine case is before the court on petitioners' motion for review of the decision

of Special Master Corcoran, which denied petitioners' claim for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–10 *et seq.* (2012 ed.). After thorough review of the record in this case and the decision of Special Master Corcoran, the court denies petitioners' claim and affirms the special master's decision.

## I. BACKGROUND

### A. Factual Background

Special Master Corcoran provided an exhaustive recitation of the facts of this case in his decision. Dec., ECF No. 160, at 2–12. Thus, the court refers readers to that decision for a comprehensive discussion of the facts. However, the court will provide a brief overview of the facts here for the convenience of the reader.

L.V. was born at term by caesarean section on March 15, 2005. Pet'rs' Ex. 1 at 7, 15–16. Although L.V. was diagnosed with several ailments in his early months (i.e., acute nasolacrimal stenosis, gastro-esophageal reflux, and onychia, among others), none of these diagnoses appeared to present any long-term health ramifications for L.V., well-child appointments found L.V. to be developing appropriately for his age, and L.V. was able to receive his vaccinations as necessary. Dec. at 2.

On November 8, 2006, L.V. was given his first dose of the flu vaccine (at approximately 20 months of age), and the second dose was administered on December 8, 2006. Pet'rs' Ex. 3 at 125, 128–29. Records from these two visits make no mention of any developmental problems or concerns from L.V.'s parents. On December 11, 2006, [E.V.] reported that L.V. was experiencing severe constipation but did not mention any other health concerns. Pet'rs' Ex. 3 at 132. L.V. visited the doctor on December 13, 2006, and for the first time the pediatric records contained a concern with "speech delay." On January 17, 2007, [R.V. and E.V.] obtained an initial early intervention assessment from Montgomery Country's provider after requesting it on January 10th. *See generally* Pet'rs' Ex. 13 at 1–11 and Ex. 30 at 475. This report placed L.V. (who was, at this time, approximately 22 months old) at eleven months for cognitive development, ten months for communication development, six months for social development, and sixteen months for fine motor/physical skills. Pet'rs' Ex. 13 at 5–6. This report also contained references to L.V.'s having lost language and expressive abilities at around 18 months old. *Id.* at 5.

On January 23, 2007, Dr. James Coplan, M.D., of Neurodevelopmental Pediatrics of the Main Line, P.C. in Rosemont, Pennsylvania, performed another early evaluation assessment of L.V. Dr. Coplan diagnosed L.V. with autism or autism spectrum disorder ("ASD"). Pet'rs' Ex. 5 at 4–6. This was the first time L.V. had officially been diagnosed with autism or ASD. On May 21, 2007, Dr. Hillary Kruger, M.D., at the Children's Hospital of Philadelphia evaluated L.V. and concurred with the earlier diagnosis of autism. *See generally* Pet'rs' Ex. 6.

Seeking further information on L.V.'s condition and possible causes, [R.V. and E.V.] eventually obtained treatment beginning in August of 2008 from Dr. Richard Frye, a physician at the Child and Adolescent Neurology Clinic at the University of Texas Health Science center in Houston, Texas. Pet'rs' Ex. 8 at 2. For the first time, Dr. Frye suggested that L.V. might have some sort of undiagnosed mitochondrial disorder that could have played a role in his autism or ASD. *Id.* A battery of tests were performed on L.V. over the course of the next two years, with the results on the whole suggesting that L.V. did not suffer from a mitochondrial disorder. *See* Dec. 9–10. On August 4, 2011, Dr. Frye diagnosed L.V. with a mitochondrial disorder according to a list of factors known as the Morava criteria. Pet'rs' Ex. 72, Part 2 at 25–26. Specifically, Dr. Frye noted that L.V. exhibited three clinical signs consistent with a mitochondrial disorder (exercise intolerance, history of regression in skills, and gastrointestinal abnormalities), three metabolic indicators based on previous bloodwork (elevated lactate, urinary tricarboxylic acid excretion, and ethylmalonic aciduria), and abnormal mitochondrial morphology as viewed via electron microscopy. Dec. 11–12. Based on these factors, Dr. Frye

scored L.V. a 9 on the Morava scale, indicating a "definite" mitochondrial disease. *Id.*

## B. Procedural Background

[R.V. and E.V.] filed their petition July 11, 2008. The petition was part of the Omnibus Autism Proceeding ("OAP"), a group of more than 5,400 test cases which claimed that certain vaccines caused autism that were joined for purposes of efficient resolution. From that group, six test cases were chosen and they presented two different theories regarding autism causation. Those theories were rejected in all six cases.[2]

Following this, [R.V. and E.V.] elected to remain in the Vaccine Program and filed an amended petition on April 9, 2012, alleging for the first time that L.V. had been diagnosed with a mitochondrial disease and that the influenza vaccine administered to L.V. on December 8, 2006, caused L.V.'s autism or ASD because of a susceptibility and vulnerability created by his mitochondrial disease. Am. Pet. at ¶ 33. Petitioners also claimed that the vaccine administered caused a regressive encephalophy resulting in L.V.'s physiological symptoms and developmental regression. *Id.* at ¶ 32. Petitioners filed a second amended petition on January 4, 2015. On April 13–14, the special master held a two-day entitlement hearing, in which the special master heard testimony from [E.V.], petitioners' experts Drs. Kendall and Shafrir, and respondent's expert Dr. Cohen.

On February 19, 2016, the special master issued his decision denying petitioners' request for compensation. Petitioners' filed the instant motion for review on March 21, 2016. Respondent filed its response on April 19, 2016. The matter is now ripe for disposition.

## II. LEGAL STANDARDS

This court has jurisdiction to review a special master's decision in a Vaccine Act case upon a properly filed petition for review. 42 U.S.C. § 300aa–12(e)(1). The court may set aside any of the special master's findings

of fact or conclusions of law if those determinations were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* at 12(e)(2)(B).

■ The court applies different standards to conclusions of law, findings of fact, and discretionary rulings. *Masias v. Sec'y of Health & Human Servs.*, 634 F.3d 1283, 1287–88 (Fed. Cir. 2011)[3]; *see also Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 871 n. 10 (Fed. Cir. 1992); *Pafford v. Sec'y of Health and Human Servs.*, 64 Fed. Cl. 19, 27 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). The court reviews conclusions of law under the "not in accordance with the law" standard," findings of fact under the arbitrary and capricious standard, and discretionary rulings under the "abuse of discretion" standard. *Saunders v. Sec'y of Health & Human Servs.*, 25 F.3d 1031, 1033 (Fed. Cir. 1994).

■ The arbitrary and capricious standard is "well understood to be the most deferential [standard] possible." *Munn*, 970 F.2d at 870. "If the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate.'" *Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d 1355, 1363 (Fed.Cir. 2012) (quoting *Hines on Behalf of Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)). "Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims." *Deribeaux ex rel. Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1366 (Fed. Cir. 2013) (quoting *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (internal citations omitted)). It is not the role of this court to "reweigh the factual evidence," "assess whether the special master correctly evaluated the evidence," or "examine the pro-

---

**2.** For a more in-depth look at this process, the court refers readers to the special master's decision at page 12, footnote 32.

**3.** "Under the Vaccine Act, [the Circuit] review[s] a decision of the special master under the same standard as the Court of Federal Claims." *Masias*, 634 F.3d at 1287.

bative value of the evidence or the credibility of the witnesses." *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000).

## III. DISCUSSION

In the motion for review, petitioners' raise five objections to the special master's decision. Petitioners claim that the special master acted arbitrarily, capriciously, and abused his discretion when he: (1) interpreted non-contemporaneous medical records and misconstrued contemporaneous medical records in finding that L.V.'s developmental delay predated his influenza vaccinations; (2) mischaracterized and credited non-contemporaneous medical records as contemporaneous in finding that L.V.'s developmental chronology showed onset of a developmental problem prior to administration of the influenza vaccines; (3) dismissed the medical diagnosis of L.V.'s treating physician and instead substituted an after-the-fact analysis improperly nullifying L.V.'s mitochondrial disease diagnosis; (4) failed to adequately consider evidence crediting the reliability of petitioners' medical theory that vaccinations could impose a stress on the immune system of a child with a mitochondrial disorder, precipitating a developmental regression with autism-like symptoms; and (5) rejected the reliability of petition's medical theory under Prong 1 of *Althen*. Mot. to Review at 2. The court shall discuss these objections in turn.

■ Petitioners' first and second objections are similar and can substantially be understood thusly: petitioners believe it was arbitrary and capricious of the special master to credit retrospective evidence regarding L.V.'s condition over the contemporaneous medical record, which petitioners argue shows that L.V.'s development was normal and age-appropriate until the influenza vaccinations, given on November 8, 2006, and December 8, 2006, respectively, were administered.

In his decision, Special Master Corcoran noted that there were "numerous occasions on which [R.V. and E.V.] reported to ASD specialist treaters that they were aware of L.V.'s problems at 16–18 months, well before he received even the first flu vaccine," which

would have occurred when L.V. was approximately 20 months old. Dec. at 52. For example, the special master notes that [E.V.], in her testimony, admitted to having concerns about L.V.'s development prior to his receipt of the flu vaccine. *Id.* at 53. Furthermore, when faced with inconsistencies in the record, the special master was able to reconcile those inconsistencies in a way which would not discredit the entire record before him. *Id.* at 53 n. 85 (special master finding that the evidence suggested that Dr. Coplan's assessment on L.V.'s self-feeding capabilities was closer to the truth than the contemporaneous pediatric record.).

In the view of the court, petitioners' objections amount to nothing more than mere disagreement with the special master's decision. As stated previously, the court reviews a special master's factual conclusions under the arbitrary and capricious standard, the most deferential standard of all. *Munn*, 970 F.2d at 870. After careful review of the case record and the special master's decision, the court holds that the factual finding that L.V.'s developmental regression began prior to the administration of the influenza vaccine was not arbitrary and capricious. The decision reflects the special master's careful review of all the evidence presented before him and details his thought process in weighing the evidence of the contemporaneous medical record prepared by L.V.'s treating pediatricians with the retrospective evidence prepared by experts such as Dr. Coplan. The special master's factual finding was obviously based upon the evidence in the record. Because it is not the role of the court to reweigh the factual evidence, the court must afford the proper weight to the special master's findings of fact.

■ Petitioners next contend that the special master erred when he concluded that L.V. did not have a mitochondrial disease or a mitochondrial dysfunction. At the hearing, the special master heard testimony from petitioners' expert, Dr. Kendall, and respondent's expert, Dr. Cohen regarding Dr. Frye's diagnosis that L.V. had a "definite" mitochondrial disease under the Morava criteria. The special master rejected petitioners' assertions that whether L.V. had a mitochon-

drial disease was simply a matter of decision whether the Morava scale's point system was satisfied by the evidence. The special master instead chose to credit the testimony of Dr. Cohen, who noted that since the Morava scale was established, more up-to-date diagnostic guidelines had been developed to analyze symptoms. Dec. at 48. It was noted that L.V. lacked any of the clear "red flag" symptoms commonly associated with the most severe phenotypes of mitochondrial disease, such as MELAS or Leigh disease. Furthermore, L.V.'s muscle biopsy and genetic testing were negative for mitochondrial disease while biomarker test results were considered largely inconclusive. *Id.* at 49. Finally, of particular importance to the special master was the admitted testimony of Dr. Kendall, who acknowledged that L.V. did not have a primary mitochondrial disease based upon the lack of severity of other symptoms, and her struggles to point to any dramatic signs of post-vaccination regression. *Id.* Typically, the kind of dramatic regression that petitioners' argue L.V. experienced would only occur to an individual suffering from one of these severe mitochondrial disorders. *Id.*

Once again, the court must afford the special master great deference on his factual findings and interpretation of the evidence presented and testimony given. In this case, it is clear that the special master thoroughly considered all of the relevant information placed before him, and ultimately considered respondent's expert, Dr. Cohen, to be the more persuasive witness. Given the admitted inherent difficulty of diagnosing mitochondrial disorders, the special master chose to downplay the significance of Morava criteria because it gave too much weight to nonspecific findings by equating them with specific "red-flag" criteria closely linked with known mitochondrial disease phenotypes. Indeed, even petitioners own expert, Dr. Kendall, admitted that Morava had "limited" application today given the development of more up-to-date criteria and testing procedures. Dec. at 32. Since the factual conclusion that L.V. did not suffer from a mitochondrial disorder is "based on evidence in the record that [is] not wholly implausible," the court cannot find that the special master's decision was arbitrary and capricious. *Lampe,* 219 F.3d at 1363.

Furthermore, to the extent that petitioners' argue that the special master erred by not applying the proper weight to Dr. Frye's diagnosis because he was one of L.V.'s treating physicians, that argument has no merit. It is well settled that the special master must consider all relevant medical and scientific evidence, as well as any diagnosis, conclusion, or medical judgment made regarding the nature, causation, and aggravation of an illness, "any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court." 42 U.S.C. § 300aa–13(b)(1). Because the record of the case reflects that the special master did carefully consider all of the evidence and the record before him, the court cannot say it was erroneous of the special master to reach a conclusion contrary to one of L.V.'s treating physicians.

■ Finally, petitioners' contend that the special master failed to adequately consider evidence crediting the reliability of petitioners' medical theory that vaccinations could impose a stress on the immune system of a child with a mitochondrial disorder, precipitating a developmental regression with autism-like symptoms. This ties into their next objection: that the special master erred when he rejected petitioners' medical theory under prong one of the *Althen* test. Overall, petitioners contend that "as a whole, the evidentiary record before the special master amply demonstrated that petitioners proffered a plausible and reliable medical theory." Mot. at 35. Petitioners' rely on *Paluck v. Sec'y of HHS* for the proposition a "vaccination can significantly aggravate· an underlying mitochondrial condition predisposing a child to defects in cellular energy metabolism manifesting as a regressive encephalophy." *Id.* (citing *Paluck v. Sec'y of HHS,* 104 Fed.Cl. 457 (Fed. Cl. 2012)). Once again, the court finds that petitioners' argument has no moment because the special master did consider petitioners' theory of causation.

In *Althen,* the Federal Circuit held that in order to establish entitlement to a vaccine Program award of compensation, a petitioner must satisfy three criteria: "(1) a medical

theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed.Cir.2005).

At the hearing, the special master heard testimony from Dr. Kendall that, in her opinion, a vaccine can cause oxidative stress in an individual with a mitochondrial disorder, resulting in a developmental regression. Mot. at 35. In analyzing this testimony, the special master noted that Dr. Kendall's testimony "primarily relied on case studies … that are limited in probative value since they describe only unrepresentative outlier instances that ultimately assume, without direct study or evidence, that vaccination could precipitate a chain of events resulting in regression." Dec. at 55. After describing why the case studies were of limited value, the special master concluded that Dr. Kendall "generally failed to provide reliable evidence plausibly linking the flu vaccine to regression in individuals with mitochondrial diseases." *Id.* Upon review, the court concludes that the special master did not err when he determined petitioners failed to satisfy the first *Althen* prong. Additionally, the special master distinguished *Paluck* from the instant case, noting that it involved different vaccines, a more obvious immediate reaction, and that most importantly, that the child's mitochondrial disease was not a contested fact. *Id.* at 39. The court agrees that *Paluck* is factually distinct from the present case—each vaccine case is the result of its own specific set of facts. The fact that the *Paluck* court found plausible the theory that the Measles/Mumps/Rubella vaccine aggravated an underlying mitochondrial disorder does not mean that advancing a similar theory under a different set of facts should satisfy *Althen*.

Overall, the special master's assessment of the experts, medical records, and other evidence and conclusion that petitioners had failed to demonstrate a causal link between DAC's vaccines and autism was not arbitrary or capricious. The record reflects that the special master carefully and thoroughly weighed the evidence before him and determined that petitioners had not provided a legally probable theory of causation-in-fact. The special master appropriately evaluated the parties' expert witnesses' credibility, citing their credentials, mastery of DAC's medical records, and ability to support their theories. Plaintiff's motion for reconsideration is, at its core, nothing more than a rehashing of arguments already raised and considered by the special master.

The court also notes that causation theories based on autism have been uniformly rejected. An initial round of test claims based on autism theories were brought and denied as part of an omnibus proceeding. *Cedillo v. Sec'y of Health & Human Servs.*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. Sec'y of Health & Human Servs.*, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed.Cl. 706 (2009); *Dwyer v. Sec'y of Health & Human Servs.*, No. 03–1202V, 2010 U.S. Claims LEXIS 86, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 201); *King v. Sec'y of Health & Human Servs.*, No. 03–584V, 2010 U.S. Claims LEXIS 87, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar 12, 2010); *Mead v. Sec'y of Health & Human Servs.*, No. 03–215V, 2010 U.S. Claims LEXIS 88, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010). Subsequently, special masters have rejected numerous claims based on autism. *See Canuto v. Sec'y of HHS*, 2016 U.S. Claims LEXIS 368, at *12 n.7.

## IV. CONCLUSION

For the reasons set forth above, petitioners' MOTION for review is DENIED and the special master's decision is affirmed. The Clerk is hereby directed to enter judgment according to the special master's decision.

**IT IS SO ORDERED.**